## PENNSYLVANIA R. CO. v. NELSON.

(Circuit Court of Appeals, Second Circuit. February 13, 1919.)

### No. 170.

1. MASTER AND SERVANT ⏀105(3)—SAFE PLACE TO WORK—NEGLIGENCE—CUSTOMARY CONSTRUCTION.

There was no negligence of the master in having in use a float on which cars were run, with a stanchion near the side of the cars; the distance being that customary in floats of the kind.

2. MASTER AND SERVANT ⏀217(5)—ASSUMPTION OF RISK.

The risk of nearness to cars of a stanchion on a float is assumed by railroad employé, who for three months, charging him with knowledge of the situation, without objection, continued to load cars on it and other like floats.

3. MASTER AND SERVANT ⏀285(7)—CAUSE OF INJURY—QUESTION FOR JURY.

Circumstantial evidence in action for death of a railroad employé, killed while engaged in loading cars in interstate commerce on a float, *held* insufficient to go to the jury; it making it a matter of speculation whether accident occurred by reason of a coil of rope negligently placed on the incline approach of a platform, or through nearness to cars of stanchion of platform, an assumed risk.

In Error to the District Court of the United States for the Southern District of New York.

Action by Sigrid Gustava Nelson, administratrix of Gustave Adolph Nelson, deceased, against the Pennsylvania Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed.

The plaintiff in error, defendant below, is hereinafter referred to as defendant. The defendant is a corporation organized and existing under the laws of the state of Pennsylvania, and is an interstate commerce railroad, which, it is alleged, operates in the states of New York. New Jersey, and Pennsylvania, and in connection with its railroad operations it maintains a freight yard in Jersey City and car floats upon which cars are transported to and from the states of New York and New Jersey.

The defendant in error, plaintiff below, is hereinafter referred to as plaintiff. The plaintiff is the widow and administratrix of her husband, who was employed by defendant as a conductor of freight trains, and, at the time of his death, was engaged in interstate commerce.

The plaintiff's intestate received the injuries from which he died on October 31, 1917, while he was engaged in loading cars upon a float in the defendant's yard in Jersey City. It is alleged that the injuries were due to defendant's negligence in failing to furnish the deceased with a reasonably safe place in which to work.

The jury returned a verdict in favor of the plaintiff in the sum of $12,273.

Burlingham, Veeder, Masten & Fearey, of New York City (Morton L. Fearey and S. C. Coleman, both of New York City, of counsel), for plaintiff in error.

Joseph A. Shay, of New York City (Leonard F. Fish, of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This suit is brought under Act April 22, 1908, c. 149, 35 Stat. 65, known as

the federal Employers' Liability Act, U. S. Compiled Statutes Ann. 1916, vol. 8, §§ 8657–8665. This act gives jurisdiction to the courts of the United States concurrent with that of the courts of the several states. The action may be brought in the district in which the cause of action arose, or in the district of the residence of the defendant, or in which the defendant is doing business at the time of the commencement of the action; and this action is brought in the Southern district of New York, in which district the defendant is engaged in business and has its principal office.

The act provides that every common carrier by railroad, while engaged in interstate or foreign commerce, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or in case of the death of such employé to his or her personal representative for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employés of such carrier, or by reason of any defect or insufficiency, due to its negligence in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

At the time of his death the plaintiff's intestate was employed by the defendant, and had been in its employment for somewhere between 13 and 14 years. That he was engaged in the work of interstate commerce at the time of the accident which resulted in his death appears clearly from the evidence, and is not controverted by the defendant. The decedent met his death while at work loading cars upon a float which was moored to a pier on the New Jersey side of the North River, and the cars and the decedent were destined for New York.

The particular float in question was constructed for the purpose of transporting cars, and had a raised platform extending through the center of it from the front to the rear. The tracks, upon which the cars were placed, extended along on either side of the raised platform. The float was long enough to hold 6 connected cars; and hence the float held 12 cars, 6 upon each side of the raised platform. The height of the platform came on a level with the floor of the cars. The platform was covered, and the roof was held up by upright timbers or stanchions. There were no closed sides nor ends to the platform; but it was entirely open, except the roof, which was upheld by the posts or stanchions as stated.

When the cars were being placed upon the float, it was necessary for the deceased to observe that they were not placed with the doors opposite these uprights or stanchions, in order that the doors of the cars should not be obstructed by these uprights, so that the cars might be freely unloaded after reaching the pier in New York. It was also the duty of the deceased to see that the doors of the cars were closed, and to ascertain when there were a sufficient number of cars upon the float, and to signal to the engineer in charge of the locomotive and train, and to see that the tracks were connected to avoid derailment. To accomplish these objects, it was the duty of the deceased to ride upon the step on the front end of the first car, of the string or section of cars, being placed upon the float. At each end of the raised platform was an approach, descending from the ends of the platform, on an incline to a slightly lower level.

Upon the night of the accident the deceased was riding upon the step on the front end of the first car being placed upon the float, where it was his duty to ride, and where it was the custom for all conductors, as well as himself, to ride, when loading the float. As the cars were being pushed toward the float, and as the first car upon which the deceased was riding entered upon the float, an outcry was heard, and the engineer stopped, and an examination disclosed the deceased lying upon the platform immediately next to the first stanchion, fatally crushed. The platform ran east and west. The cars were being pushed on from the west, and the deceased was found lying upon the platform with his head in a northwesterly position and his feet in a southeasterly position, and about 3 to 5 feet east of the first stanchion. The unmistakable conclusion is that the deceased met his death by being crushed between the first stanchion and the car. There was a clearance of only 11 inches between the stanchion and the car. He had been rolled through the space between the car and the stanchion. He sustained a fracture of the pelvis and other internal injuries from which he died; but his legs were not crushed, and the man's head was not cut in any way and his shoulders were unhurt.

No person was a witness of the accident. But it is claimed by the plaintiff that the position in which the deceased was found shows that on reaching the incline approach to the platform he got off the step of the car and upon the incline, as was the custom, and in doing so stepped upon or into a large coil of rope which had been placed there, and that this caused him to stumble and fall against the stanchion, and that he was rolled around it, and his body was thrown as he was rolled through.

The case was brought on the theory that the defendant had failed to furnish the plaintiff's intestate with a safe place in which to work. That the place was unsafe: (1) Inasmuch as the space between the stanchion on the float and the side of the car as it entered the float and passed the stanchion was too narrow. (2) Because a coil of rope was negligently placed upon the incline approach of the platform.

[1, 2] The trial court withdrew from the jury's consideration the first of the above claims. The undisputed evidence was that the float was built as floats are customarily, and the distance between the stanchion and the side of the car was the customary distance in floats of this kind. It was not negligence, therefore, for the defendant to have in use such a float; and, if it had been negligence, the plaintiff was chargeable with knowledge of the distance between the stanchion and the side of the car, as he had been working for three months prior to the accident on this and other like floats, and as he worked on with knowledge and without objection he must be held to have assumed the risk. There was no error in withdrawing that matter from the jury.

But the presence of the coil of rope on the incline of the platform was quite another matter, and must now be considered. The plaintiff contends:

"That the defendant was guilty of negligence in placing the rope upon the incline where conductors were compelled to step from moving cars in the night, and that the facts warranted the inference that the deceased in stepping from the car upon the platform stumbled upon the coil of rope and was pre-

cipitated forward between the stanchion and the car, thus rendering the defendant liable."

It appears that at the time of this accident rope was lying on the incline of the platform. A member of the decedent's crew, who had worked for three or four years in loading cars on the float, was asked whether he had in the course of that time ever seen a coil of rope lying as that did upon the incline, and he said that he had never seen one coiled up like that. He had sometimes seen a rope lying on the incline, but he had never seen it lying there coiled. And the examination of another witness, a member of decedent's crew, was as follows:

"Q. Did you, in the time you worked there, ever see a coil of rope upon an incline? A. I never saw it coiled up like that.

"Q. What did you see? A. I most generally saw it laying lengthwise on the side of the track, or in the center of the track, or lengthwise on the platform.

"Q. But on a level with the platform? A. Yes.

"Q. And never on the incline? A. No, sir."

And on cross-examination:

"Q. You have seen them [ropes] lengthwise on the platform? A. Yes.

"Q. But you never saw one on the slope of the platform? A. No, sir."

And on this particular occasion the rope lay near the side of the platform and about 4 or 5 feet from the first stanchion. It was a 5-inch rope, was 50 feet in length, brand new, and "was all tied up,'" and "looked as if it never had been used." It was coiled up "pretty big." A witness, who was asked whether, after the accident, his impression was that the rope was "neatly coiled," answered, "Yes."

"Q. It was not scattered around? A. No; it was not scattered around."

From the fact that it was not scattered, the defendant claimed the deceased could not have tripped over it. But, as the coil was tied up, the strength with which it was tied might account for its not "being scattered around," if the plaintiff had tripped over it or stepped into it. The defendant produced two or three witnesses who testified that the incline was a proper place on which to keep the rope, and that it was usually kept there.

The assistant boatman of the defendant's New York division, called by the defendant, was asked on cross-examination whether he meant to say that the incline was a safe place for the coil of rope to lie. His reply was:

"It is obvious it is not the absolutely safest place, but it is the common place. There are a great many unsafe things done in life."

And he said:

"Wherever it might be placed, it presents an obstruction, obviously."

The defendant also placed on the stand the foreman of the bridges. He was asked on cross-examination whether he thought that the rope lying on the incline was the cause of the plaintiff's death. No objection was made to the question, and he replied, "I cannot answer that." He was then asked whether he thought the plaintiff walked over the rope. And he replied, "I cannot answer it." But counsel for

defendant objected to the last question, and the court sustained the objection. It developed that after the accident the witness had removed the rope from the incline. He was asked why he had removed it. And he replied:

"And I took the rope off, so nobody else would stumble over it and get hurt, on account of being up on the end sill, on account of the doctor and the rest of them.

"Q. That is the reason you took it off of the incline? A. Yes, sir."

[3] The plaintiff contends that the deceased could not have been caught between the stanchion and the car while standing on the car step, as he well knew it was sure death to have remained there, and that it was the custom for him and other conductors to step upon the incline when they reached it, and that if he had remained on the step his legs would have been crushed, and they remained uninjured; that the practice was to jump off from the step of the car to the incline of the platform.

The defendant contends that there is no evidence tending to show that the presence of the rope caused the accident, but that the jury was permitted from the mere presence of the rope to speculate as to the cause of the death.

Now the law undoubtedly is that a plaintiff must make out his case by a preponderance of the evidence. A jury cannot base their verdict upon mere conjecture and a bare possibility. If it appears that the damages claimed were occasioned by one of two causes, for one of which the defendant is responsible, and for the other of which it is not responsible, the plaintiff must fail if the evidence does not disclose that the damage was produced by the former cause; and she must fail, also, if it is just as probable that they were caused by the one as by the other. Searles v. Manhattan Ry. Co., 101 N. Y. 661, 5 N. E. 66. And in Ruback v. McCleary, 220 N. Y. 188, 115 N. E. 449, the court, referring to the rule, declared that—

"If the matter [the cause of the injury] is left in doubt, and it is as probable that the injury was the result of one cause as the other, there can be no recovery."

The disposition to be made of this case in this court must depend upon whether there was any evidence in the case which warranted the jury in finding that the deceased met his death in the manner which the plaintiff claims; for it is settled law that it is error to submit a question to a jury where there is no evidence upon the subject. In Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L. Ed. 867, the court declared that it was held at one time that if there was a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority had established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

In Pollock v. Pollock, 71 N. Y. 137, 153, the New York Court of Appeals, speaking through Judge Folger, said, "Insufficient evidence

is, in the eye of the law, no evidence," and cited the language of Maule, J., in Jewell v. Parr, 13 C. B. 916, where he said:

"When we say that there is no evidence to go to a jury, we do not mean literally none, but that there is none that ought reasonably to satisfy a jury that the fact sought to be proved is established."

In Bond v. Smith, 113 N. Y. 378, 385, 21 N. E. 128, 130, Earl, J., said:

"We have no right to guess. * * * She [the plaintiff] simply furnished them [the jury] food for speculation, and that will not do for the basis of a verdict. The law demands proof, and not mere surmises. The authorities are ample to show in such a case the plaintiff should have been nonsuited."

In Pauley v. S. G. & L. Co., 131 N. Y. 90, 99, 29 N. E. 999, 1001, 15 L. R. A. 194, Judge Finch, speaking for the court, said that—

"We are not to resort to conjecture, and permit a verdict to be based on bare possibilities alone. * * * A mere conjecture, built upon a bare possibility, will not suffice to transfer the money or property of one man to the possession and profit of another."

In Laidlaw v. Sage, 158 N. Y. 73, 52 N. E. 679, 44 L. R. A. 216, the New York Court of Appeals reviewed a long line of decisions in that state showing that that court has uniformly held that, to justify the submission to the jury of any issue, there must be sufficient proof to sustain the claim of the party upon whom the onus rests, and "that mere conjecture, surmise, speculation, bare possibility, or a mere scintilla of evidence, is not enough." And see Baulec v. N. Y., N. H. & H. R. Co., 59 N. Y. 356, 366, 17 Am. Rep. 325; Cordell v. N. Y. C. & H. R. R. Co., 75 N. Y. 330; Dubois v. City of Kingston, 102 N. Y. 219, 6 N. E. 273, 55 Am. Rep. 804; Linkauf v. Lombard, 137 N. Y. 417, 425, 33 N. E. 472, 20 L. R. A. 48, 33 Am. St. Rep. 743; Hemmens v. Nelson, 138 N. Y. 517, 34 N. E. 342, 20 L. R. A. 440; Hudson v. R., W. & O. R. Co., 145 N. Y. 408, 412, 40 N. E. 8; Moscato v. Prince Line, Limited, 164 App. Div. 412, 417, 150 N. Y. Supp. 225.

At the close of the plaintiff's case counsel for defendant moved to dismiss the complaint. But the court, after expressing the opinion already referred to, that the deceased had assumed the risk of the narrow space between the stanchion and the side of the car, did not think it could be held that the deceased had assumed the risk of the coil or rope on the incline of the platform, and that that question was for the jury, as was the question whether the intestate's death was caused by the presence of the coil on the incline. Counsel for defendant argued that the deceased had assumed the risk of any injuries resulting from the condition of the stanchion or the condition of the rope, and claimed that there was no evidence that the rope had anything to do with the accident. Thereupon the court said:

"It seems to me that is a question of fact. I think the evidence of its location with reference to the stanchion is such that I have to let the jury pass on it."

And counsel replied:

"I want to call attention to one significant fact: If this man stumbled over a rope from a car which was moving forward, his motion was forward, and

259 F.—11

it seems to me absolutely impossible that he could have been injured around the hips, and not have been injured on his shoulders or his head."

The court remarked, "That is an argument." Whereupon counsel continued to argue the matter at length, and when he had concluded the court denied his motion.

If there was some evidence that the rope was the cause of the accident, and the place where the body was found and the nature of the injuries upon it indicated that death resulted from that cause, it would not be unreasonable to infer that the deceased had according to the usual practice stepped from the car to the incline and stumbled on the coil of rope. As no one saw the accident, the cause is a matter of inference. Did the deceased meet his death by remaining, contrary to custom, on the step of the car, when he must have known that remaining there meant probable death; or did he in the customary manner attempt to alight upon the incline, and in so doing stumble over the rope and into the space between the stanchion and the car? The jury has found that he did the latter. That verdict must stand, if there is evidence from which the jury could legitimately arrive at the conclusion they reached. As no one witnessed the accident, the evidence is indirect and circumstantial, and a jury may, if the circumstances are sufficient, infer the cause of death. Harrison v. N. Y. C. & H. R. R. Co., 195 N. Y. 86, 89, 87 N. E. 802. But the circumstances must be sufficient. In Lopez v. Campbell, 163 N. Y. 340, 347, 57 N. E. 501, 503, the court said that—

"While a material fact may be established by circumstantial evidence, still, to do so the circumstances must be such as to fairly and reasonably lead to the conclusion sought to be established, and to fairly and reasonably exclude any other hypothesis. Where the evidence is capable of an interpretation which makes it equally consistent with the absence as with the presence of a wrongful act, that meaning must be ascribed to it which accords with its absence. In other words, it can only be established by proof of such circumstances as are irreconcilable with any other theory than that the act was done. As has been said: 'Insufficient evidence is, in the eye of the law, no evidence.'" Wheelan v. Chicago, etc., R. Co., 85 Iowa, 167, 175, 52 N. W. 119; Asbach v. Chicago, Burlington & Quincy Railway Co., 74 Iowa, 250, 37 N. W. 182.

Verdicts must not rest upon supposition, but upon evidence. Applying the doctrine stated to the instant case requires that circumstances proven. must be irreconcilable with the theory that the intestate remained on the step of the. car and was crushed between the stanchion and the car, which was a risk which he had assumed. To charge the jury that they must be reasonably satisfied that the coil of rope was the cause of the intestate's death cannot save the verdict, if there is no evidence which shows that the death happened because of the coil of rope, and not because the plaintiff failed to alight upon the incline.

The difficulty in this case arises from the possibility that death may have happened in either of two ways, and that, if it happened in one of these ways, there can be no recovery, as the risk had been assumed; so that the evidence that the death occurred in one way and not in the other must not rest upon conjecture, surmise, speculation, and bare possibility, but it must be convincing in its nature. The position in

which the body was found on the platform, the crushed hips and pelvis, the uninjured head, shoulders, and legs, and the undisturbed coil of rope are the circumstances which the evidence discloses. From those circumstances alone we do not think it possible for any jury to decide, except as a matter of mere conjecture and speculation, whether the plaintiff's intestate attempted to get upon the platform at the incline, and tripped over the rope, and fell between the stanchion and the car, and was thus crushed and rolled upon the platform, or whether he rode past the incline, and his hips were caught and crushed between the stanchion and the car while he was standing upright on the step of the car, and the motion of the car rolled his body, so that it was found lying east of the stanchion.

To say that the facts reveal as clearly how the accident occurred as if an eyewitness had described it, as counsel argued in this court, seems to us wholly unwarranted, and very far from the fact. The only thing certain is that the deceased met his death in one way or the other, but in which way is purely a matter of speculation or surmise; and as he had assumed the risk of death in one of these two ways the plaintiff is not entitled to recover because she has not proved that the deceased met his death by the risk which he had not assumed. To hold otherwise is to allow a jury to speculate upon the cause of death, and to allow that is to trifle with the rights of parties. Patton v. Texas & Pacific Railway Co., 179 U. S. 658, 665, 21 Sup. Ct. 275, 45 L. Ed. 361.

It has been said that a judgment of a trial court is not to be reversed on a mere conjecture. Britt v. Omaha Concrete Stone Co., 99 Neb. 300, 303, 156 N. W. 497. That is certainly true, and it is also true that a judgment of a trial court cannot stand if it rests on a mere surmise.

Judgment reversed.